**James D. COLE, Appellant,**

v.

**Mary Franklin Carter COLE, Dale Padgett, J. H. Padgett, Appellees.**

No. 79–1332.

United States Court of Appeals,
Fourth Circuit.

Submitted Feb. 8, 1980.

Decided Oct. 9, 1980.

Frank D. Cherry, Jr., James J. Wall, Cherry & Wall, Wilmington, N. C., on brief, for appellant.

Joseph C. Olschner, Roger A. Moore, Jacksonville, N. C., F. E. Wallace, Jr., Wallace, Langley, Barwick & Landis, Kinston, N. C., on brief, for appellees.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and HAWKINS *, District Judge.

MURNAGHAN, Circuit Judge:

Plaintiff's suit was terminated in the district court partly by a grant of summary judgment, partly by a ruling that plaintiff had failed to state a claim on which relief could be granted, and partly by a ruling that some of plaintiff's claims fell within the domestic–relations exception to federal diversity jurisdiction. We affirm in part and reverse in part.

I.

On November 16, 1977, James D. Cole, a resident of Georgia, brought suit for compensatory and punitive damages against Mary Franklin Carter Cole (his former wife), against Dale Padgett (a deputy sheriff in the Sheriff's Department of Onslow County, North Carolina), and against J. H. Padgett (a policeman with the town of Holly Ridge, North Carolina). All defendants are residents of North Carolina.[1] In addi-

---

* The Honorable Falcon B. Hawkins, United States District Judge for the District of South Carolina, sitting by designation.

1. The complaint as originally filed also listed the Hartford Fire Insurance Company as a defendant in connection with Count 2. The dis-

tion to invoking diversity jurisdiction, plaintiff suggested that some of the Padgetts' acts under color of state law had violated 42 U.S.C. § 1983 (1976).

Plaintiff's allegations may usefully be subdivided into four general groups:

"Count 1"[2]–Plaintiff charged Mary Cole with malicious prosecution and abuse of process. The factual underpinnings of Count 1 consisted of allegedly numerous and knowingly false criminal charges initiated for purposes of harassment by the defendant, Mary Cole, against the plaintiff during the time that they were still married.[3] The criminal charges plaintiff claims were preferred against him included:

(a) secretly installing a live electric wire or wires in Mary Cole's[4] house, with intent to shock anyone who entered;

(b) using profane and indecent language in telephone calls, involving Mary Cole and others;

(c) assaulting Mary Cole;

(d) abandonment and nonsupport of Mary Cole.

"Count 2"–Plaintiff alleged that Mary Cole and Dale Padgett had conspired to burn or to cause to be burned on November 30, 1974, a dwelling house owned and occupied by the plaintiff. He further charged that, prior to the fire, Mary Cole had caused the fire insurance on the dwelling to be transferred from plaintiff's name to her name and that she be designated as beneficiary. The designation of beneficiary change assertedly was done without notification to or approval by the plaintiff, who claimed that he did not discover the change until he attempted to collect the proceeds due for the loss of his house and was told that his request for payment was denied because the proceeds had already been paid to Mary Cole. Also, plaintiff alleged that prior to the fire Mary Cole and her co–conspirators had removed from the house several thousand dollars worth of personal property belonging to the plaintiff.

In support of Count 2, plaintiff filed an affidavit in which he swore that, prior to the burning of the house, Mary Cole had threatened to destroy everything that the plaintiff had; that on the day of the fire, prior to it, he had seen Mary Cole in the immediate vicinity of his home; and that after the fire had begun, he saw Dale Padgett in the vicinity of the house. Plaintiff further swore that the "fire was set by someone," that plaintiff had not set the fire himself, and that, on the day of the fire shortly before it began, Mary Cole had tried to run plaintiff's truck off the road while plaintiff was driving it.

Mary Cole filed an affidavit in which she swore that plaintiff had told her several times that he would burn his house down before he would give it to any woman through a divorce or separation agreement; that with the protection of the Onslow County Sheriff's Department she had retrieved some of her personal property from the house between October 18, 1974, and November 14, 1975, but that she had not returned to the house after November 15;

---

trict court dismissed the claim against Hartford for lack of jurisdiction, and plaintiff does not contend here that the dismissal was erroneous.

2. The claims referred to as "Count 1" appear in Section III of the complaint; the claims called "Count 2" appear in Section IV; and so on.

3. Inconsistently, the plaintiff asserts in his complaint: "*Prior to the divorce* Mary Franklin Carter Cole repeatedly harassed and abused the plaintiff by resorting to the Courts of the State of North Carolina and causing the malicious prosecution of the plaintiff in numerous criminal actions." (emphasis added) Yet in his Brief he asserts: "The plaintiff and the defendant, Mary Franklin Carter Cole, were previous-

ly married and *divorced prior to the occurrence of any of the acts which are the subject of this action.*" (emphasis added)

We shall accept the actual pleading, rather than a generalization in the Brief and proceed on the basis that the two parties were married at the time of the initiation of the criminal actions underlying the claims.

4. An affidavit filed by Mary Cole stated that the house involved was James Cole's house and that, approximately two and a half weeks after Mary Cole had permanently separated from him, someone accompanying her was shocked when she entered the house to retrieve some of her personal property.

that she did not cause, or conspire with anyone to cause, the fire which burned down the house; that on the evening of November 30, 1974, when the house burned, she was at her father's house in Sneads Ferry, North Carolina. Several other persons provided affidavits in which they swore that they had seen neither Mary Cole nor Dale Padgett near plaintiff's house during the time immediately before or immediately after the fire and that, while the house was burning, plaintiff had been seen standing in the rain leaning against a tree looking very intoxicated.

"Count 3"—Plaintiff alleged that although he had adequately prepaid the premium for his automobile liability insurance, Mary Cole had contacted the insurance company and requested it to cancel coverage. The company then cancelled the insurance without immediately notifying the plaintiff. Plaintiff further alleges that, before he received notice of the cancellation, Mary Cole and Dale Padgett had conspired to cause plaintiff's arrest for operating a motor vehicle without meeting the requirements of North Carolina's financial responsibility statute. Allegedly, pursuant to the asserted conspiracy, Dale Padgett stopped plaintiff's motor vehicle and attempted to arrest plaintiff for operating it without liability insurance. When plaintiff, however, was able to produce what appeared to be a valid automobile liability insurance policy card which indicated on its face that the liability insurance was still in force, Dale Padgett did not proceed to arrest the plaintiff, but he did verbally harass and abuse plaintiff. In his affidavit, plaintiff swore that the encounter took place on approximately November 23, 1974; that Dale Padgett had told the plaintiff that Mary Cole had said to Dale Padgett that the plaintiff did not have liability insurance because she had had it cancelled; and that after Dale Padgett saw the liability insurance card, he told plaintiff that "he was going to get the Plaintiff one way or the other," that he "had been laying for the Plaintiff," and that he would shoot the plaintiff.

"Count 4"—Plaintiff alleged that on June 21, 1976, Dale Padgett and J. H. Padgett had stopped plaintiff's motor vehicle without cause and had proceeded to harass and abuse the plaintiff. The alleged harassment and abuse included unprovoked assault and battery resulting in physical injury to the plaintiff.

In support of that allegation, plaintiff swore in his affidavit that he had been stopped around 9:30 p. m. while safely and properly driving through Holly Ridge, North Carolina. According to the affidavit, the two defendants were both in an unmarked green Sheriff's Department car when they flagged him over and asked to see his driver's license and vehicle registration. Plaintiff contends that, notwithstanding his compliance with the request, they attempted physically to extract him from the vehicle, drew a gun on him, and physically beat him with a blackjack. They released plaintiff only after having received instructions over the radio to turn him loose. Plaintiff then drove a few miles down the road, reported the incident to the Onslow County Sheriff from a pay phone, and proceeded directly to a hospital where he received treatment for his injuries, which he described as a dislocated shoulder and abrasions. An emergency room bill accompanying the affidavit showed that plaintiff had been admitted to the hospital at 10:25 p. m. At the bottom of the bill was written: "dx. Abrasion (L) forearm."

Affidavits submitted by the defendants stated that, during the afternoon of November 21, 1976, plaintiff had appeared at a gasoline station in a very intoxicated condition; that, when a member of the gasoline station staff had spoken well of Dale Padgett, plaintiff had raised a pipe wrench as if to strike the individual; that plaintiff's drunken condition and the assault had been reported to Dale Padgett; and that when plaintiff drove past the gas station a half an hour later, Dale Padgett followed him in a marked Sheriff's Department car to stop him. Affiants who stated that they had observed the afternoon encounter either from across the street or from a block or two away swore that plaintiff's vehicle was stopped only for a matter of 10 minutes or

so; that J. H. Padgett arrived to assist Dale Padgett after a few minutes; and that there was no observed physical contact between the defendants and plaintiff.

Plaintiff's affidavits denied the alleged encounter at the gas station.

Defendants, who had timely requested a jury trial on all issues, moved that summary judgment be granted in their favor as to some counts and that the case be dismissed as to all others. Over plaintiff's objections, the district court, in a one–paragraph opinion, adopted a magistrate's "Proposed Findings of Fact," "Proposed Conclusions of Law," and "Proposed Order."

The court thereby ruled that Counts 1, 2, and 3 concerned matters of domestic relations and thus were not within the jurisdiction of the federal courts. Accordingly, Count 1 (malicious prosecution and abuse of process) and Count 2 (arson, conspiracy, conversion) were dismissed for want of subject matter jurisdiction.

The court also indicated that if it "chose" to exercise jurisdiction, it would grant summary judgment as to Count 2 because affidavits filed by the defendants had established that they were nowhere in the vicinity of the plaintiff's house at the time it burned.

Notwithstanding the court's adoption of the statement elsewhere in the magistrate's opinion that there was no subject matter jurisdiction over Count 3 (stopping plaintiff's truck for lack of insurance), the court adopted the magistrate's recommendation that Count 3 be dismissed on the merits for failure to state a claim upon which relief might be granted.

Finally, the court granted summary judgment with respect to Count 4 (vehicle stop on June 21, 1976). It first stated that defendants' alleged conduct, even if tortious under state law failed as a matter of law to rise to a violation of 42 U.S.C. § 1983. Turning to claims because of state–law torts, the court held that plaintiff was time–barred under North Carolina's one–year statute of limitations for assault, bat-tery, or false imprisonment. *See* N.C.Gen. Stat. § 1–54(3) (1969).

Plaintiff appealed.

## II.

In dismissing the first and second counts, the district court invoked the general principle that Congress had not given the federal courts original diversity jurisdiction over domestic relations cases. *See, e. g., Wilkins v. Rogers*, 581 F.2d 399, 403–04 (4th Cir. 1978); *Spindel v. Spindel*, 283 F.Supp. 797 (E.D.N.Y.1968) (describing fully the history of the domestic relations exception). *See generally* 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3609 (1975 & Supp.1980). As the basis for its decision, the district court noted that Counts 1, 2, and 3 of the plaintiff's complaint were "grounded in a marital dispute, and that the plaintiff [was] attempting to relitigate in federal court, the same issues which were the subject and cause of his divorce from defendant Mary C. Cole."

In granting diversity jurisdiction to the district courts, Congress did not authorize them to declare *ab initio* litigants' rights and duties under family relations laws. That is, the district courts have no original diversity jurisdiction to grant a divorce, to award alimony, to determine child custody, or to decree visitation. *But see Solomon v. Solomon*, 516 F.2d 1018, 1030 n.3 (3d Cir. 1975) (Gibbons, J., dissenting). Once some other court has articulated such rights, however, federal courts have often been called on under diversity jurisdiction to rule on the validity of the prior state or foreign judicial action or to determine the existence *vel non* of a breach of the duties established in that action, especially where the duties are no longer subject to modification. *See, e. g., Keating v. Keating*, 542 F.2d 910 (4th Cir. 1976); *Crouch v. Crouch*, 566 F.2d 486 (5th Cir. 1978); 13 Wright, Miller, & Cooper, *supra*, § 3609, at 670–73. Sometimes a district court has, however, sought to avoid ruling on the existence of such breaches especially when the court perceived an attempt *de facto* to reopen and relitigate the prior judicial determination

by casting the case otherwise formally, but substantially pleading a divorce or property allocation case. An influencing factor may have been the consideration that the contemplated proof was particularly distasteful to the district court. *See, e. g., Thrower v. Cox*, 425 F.Supp. 570, 574 (D.S.C.1976) ("In the complaint, and its proposed amendment, the plaintiff has pled, wishes to raise, and the greater portion of the case would be occupied by, the issues of adultery and recrimination, which can hardly be characterized as contractual causes of action and defenses. The relief sought is primarily a new division of the marital property and a grant of alimony .... In order for this court to determine if alimony is appropriate it will be necessary to essentially try the prior case de novo. ... [The court] would be required to hear the same sordid evidence concerning adultery as a possible bar to alimony and adultery on behalf of the defendant on the issue of recrimination.").[5] Overcrowded dockets in federal courts have also contributed to a desire to read broadly the domestic relations exception to federal diversity jurisdiction. *See, e. g., Cherry v. Cherry*, 438 F.Supp. 88, 90 (D.Md.1977) ("[T]he Court is unwilling to increase the workload of this already overburdened court by ignoring a rule that has existed for over 100 years without any intimation of Congressional disapproval."); *Thrower v. Cox*, 425 F.Supp. at 573 ("The field of domestic relations is so vexatious, time-consuming and specialized that virtually every state in the Union has established a separate system of family courts to prevent their own trial courts from being overburdened. As it has done consistently in the past, the federal court system should allow them that dubious honor exclusively.").

Such statements, however, merely emphasize that federal courts will be alert to preclude what are genuinely divorce, alimony, or child custody and support cases from creeping around the barrier. Understandably but incorrectly, in seeking to expand the exception to federal jurisdiction, district courts have occasionally looked beyond the nature of the rights which the proposed litigation seeks to establish. Such courts have referred more globally to exceptions grounded on "the domestic relations *nature*" of a case, *Cherry v. Cherry*, 438 F.Supp. at 90 (emphasis added), or to "a judicial exception to federal jurisdiction ... with respect to intra–family feuds." *Bacon v. Bacon*, 365 F.Supp. 1019, 1020 (D.Or.1973).

Not all family feuds, however, fall directly into the specialized category of true domestic relations cases (primarily divorce, alimony, child custody and support). A district court may not simply avoid all diversity cases having intrafamily aspects. Rather it must consider the exact nature of the rights asserted or of the breaches alleged. As Judge Weinstein wrote in the *Spindel* case: "A federal court is not deprived of competence merely because the parties involved are husband and wife or the controversy might be termed a 'marital dispute.' ... If a woman were suing her former husband for assault and battery in federal district court, no one would question the court's power to award the plaintiff damages." 283 F.Supp. at 812.

The instant case does not present any true domestic relations claims. Even though the parties have been marriage partners, where alleged breaches (whether tortious or contractual in nature) are of a duty which does not arise solely from family relations law, a federal district court may not deny jurisdiction simply on the grounds of the supposed etiology of the emotions underlying either the alleged breach by the defendant or the decision by the plaintiff to bring suit.

The duty to abstain from malicious prosecution, from abuse of process, from arson, and from conversion does not arise out of or require, in order to give rise to the duty, a present or prior family relation. Mr. and Mrs. Cole may have very strong

---

5. Since the instant complaint alleges no breach of family–relations duties which were established in a prior judicial action, we express no opinion on when, and to what extent, actions on such breaches are properly excluded from diversity jurisdiction.

feelings about each other because they had been married to each other. If she did any of the things he has alleged, she may have done them because of those feelings. Comparable feelings on his part may be inspiring the present litigation. But since deciding this case would not require the court either to adjust family status or to establish duties under family–relations law or to determine whether or not such duties had been breached, affirming the district court with respect to the absence of subject matter jurisdiction would be significantly and illogically to expand the exception to diversity jurisdiction. The claims asserted could have arisen between strangers, and certainly between people with no marital relationship whatever. The structure of the asserted actions is such that they do not require the existence of any rule particularly marital in nature as a substantial ingredient to give them vitality. We, therefore, disagree with the district court's application here of the marital exception. So long as diversity jurisdiction endures, federal courts cannot shirk the inconvenience of sometimes trading in wares from the foul rag–and–bone shop of the heart.

The dismissal of Counts 1 and 2 for lack of jurisdiction must, therefore, be reversed. We, of course, express no opinion as to the probable outcome. Plaintiff still will have the burden of proof. We rule only that there was jurisdiction which precluded dismissal for want thereof.

### III.

■ In its opinion, the district court indicated that if it had had jurisdiction, it would have granted summary judgment for defendants concerning Count 2 (the allegations connected with the destruction by fire of plaintiff's house). We have ruled that the district court did in fact have jurisdiction. Therefore, we discuss the propriety of summary judgment on the present record.

Although the district court purported to credit all of plaintiff's affidavits, in its "Proposed Findings of Fact" it also credited defendants' affidavits even when those affidavits were inconsistent with inferences favorable to the plaintiff which could reasonably be drawn from affidavits submitted by him. For instance, although plaintiff swore that on November 30, 1974, after the house fire commenced, he had seen Dale Padgett in the vicinity of the house, the district court "found" (apparently on the strength of affidavits from Dale Padgett's wife and in–laws) that it was not until December 1, 1974, that Padgett returned to Onslow County, North Carolina, from a Thanksgiving trip to Lima, Ohio. As the term "*Findings* of Fact" indicated–and as counsel for the plaintiff vainly pointed out to the district court–the magistrate was dealing with a motion for summary judgment as if it were a hearing on the merits in a nonjury trial. At the summary judgment stage, improbability of one party's version is not enough. The improbable does, now and again, occur. "[E]vidence purporting to create doubts as to facts that is too incredible to be accepted by reasonable minds will not prevent summary judgment," but the party opposing summary judgment is entitled to "the benefit of all reasonable doubts." 10 C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 551 (1973).

If, with respect to a material fact, some inferences favorable to one party are inconsistent with some inferences favorable to another, summary judgment is inappropriate even if a clever factfinder should discover a possible set of inferences consistent with the purely factual allegations of all the affidavits submitted. Selecting one set of conflicting inferences, as opposed to another, is part of the ultimate factfinding process, not of the disposition at the summary judgment stage.[6]

The district court's inappropriate factfinding infected the suggested judgments

---

6. *See Winters v. Highlands Ins. Co.*, 569 F.2d 297, 299 (5th Cir. 1978) (" 'A summary judgment may be improper even though the basic facts are undisputed if the parties disagree regarding the material factual inferences that

properly may be drawn from these facts', *Lighting Fixture and Electric Supply Company v. Continental Insurance Company*, 5 Cir., 1969, 420 F.2d 1211, 1213.").

under Count 2 against both Mary Cole and Dale Padgett. With respect to Mary Cole, plaintiff's affidavit swore that on unspecified dates she had removed some of plaintiff's personal property from the house; that she had had the insurance on the house transferred into her name with herself named as beneficiary; that she had threatened to destroy everything that plaintiff owned; that after the plaintiff's house burned she collected the proceeds from the insurance; and that she had been seen in the vicinity of the house shortly before the fire broke out. Assuming the truth of plaintiff's statements and assuming all reasonable inferences from them favorable to plaintiff, we must credit the existence of an articulated threat to plaintiff's property, a recent attempt to harm him, a personal motive to see him damaged, a financial motive to see the house destroyed, and opportunity to have set the fire. Accordingly, summary judgment in favor of the defendant, Mary Cole, with respect to the alleged conversion of plaintiff's personal property, destruction of his house, and appropriation of the insurance proceeds could not be appropriate on the merits of the controversy.[7]

With respect to defendant Dale Padgett under Count 2, for summary judgment purposes, we must assume on the basis of plaintiff's affidavit that Dale Padgett was present in the vicinity of plaintiff's house the night it burned. The record before the court (as to which it stated that it would have granted summary judgment, had it not already granted a motion to dismiss) contained no evidence (other than alibi evidence) which tended to establish Dale Padgett's nonliability on Count 2. It did not even contain a denial by him that he had participated in burning down plaintiff's house.[8] If defendant had put in evidence tending to establish his nonliability, plaintiff could not have rested simply on the bare allegations in the complaint to resist summary judgment.[9] Analogously, where plaintiff's affidavit contradicts the only evidence before the court which tends to establish Dale Padgett's nonliability (the wife's and in-laws' statements as to his absence from the scene on the critical date), Padgett cannot achieve summary judgment solely on the bare denial in his answer. On the present record, therefore, the district court would have been in error if it had awarded summary judgment for defendant Dale Padgett on Count 2.

## IV.

With respect to Count 3,[10] there is no allegation that defendant Dale Padgett

---

7. *See* 10 C. Wright & A. Miller, *supra*, § 2727, at 526–28 ("Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it.").

  Because of North Carolina's three–year statute of limitations for conversion, *see* N.C.Gen. Stat. § 1–52(4) (1969), judgment may hereafter properly be entered, however, without regard to the merits, in favor of defendant Mary Cole, if and to the extent that the proof establishes that the alleged takings of plaintiff's personal property occurred on or before November 15, 1974.

8. Defendant Dale Padgett had submitted to the court an affidavit containing a denial that he had participated in any way in the burning of plaintiff's house, but by stipulation of the parties the affidavit was withdrawn from the record and was not considered for purposes of judgment on the pleadings or of summary judgment. In indicating that the present record is insufficient to sustain a summary judgment against the plaintiff, we do so without prejudice to Padgett's right to renew the motion for summary judgment after an expansion of the record and after adequate opportunity for discovery, should the district court in its discretion allow such expansion. We, of course, express no opinion as to how any such motion should be disposed of, bearing in mind especially the possibility of counter–affidavits or other discovery. We only wish to make clear that such a motion is not foreclosed by anything expressed in this opinion.

9. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

10. If the district court had been correct in its statement that Count 3 fell within the domestic relations exception to diversity jurisdiction, we would have been constrained *sua sponte* to

participated in effecting an unauthorized cancellation of plaintiff's automobile liability insurance. Since driving without the required insurance is a strict liability offense, presence of probable cause for Padgett to stop plaintiff's vehicle is not negated by plaintiff's allegations that Padgett had been told that the insurance had been cancelled without plaintiff's knowledge or authorization. As for Padgett's conduct once the vehicle was stopped, plaintiff has alleged no harm flowing from the verbal "harass[ment] and abuse." [11] Since the district court was not deprived of subject matter jurisdiction by the suggested "domestic relations nature" of Count 3, we affirm dismissal of this count against Dale Padgett for failure to state a claim on which relief can be granted.

As for the claim under Count 3 against Mary Cole, the fair intendment of the complaint is that her cancellation of plaintiff's automobile liability insurance was unauthorized by the plaintiff (even if her status as plaintiff's wife were sufficient to give her apparent authority in the eyes of the insurance company to order the cancellation). By purporting to act as plaintiff's agent, Mary Cole assumed a fiduciary duty to him. Absent some defense, she is subject to liability to him for any damages which he suffered as a result of her breach of that duty, especially where her alleged report to Dale Padgett was for the purpose of, and succeeded in, precipitating plaintiff's alleged damage.

Thus, as to her, Count 3 should not have been dismissed.

### V.

Even if the affidavits submitted by plaintiff and those submitted by the defendants with respect to Count 4 in fact referred to the same event (something as to which the record is by no means clear), they present a question of fact which may not properly be resolved on a motion for summary judgment. Where the affidavits raise an uncertainty as to whether the nighttime event complained of was in fact the same as the innocuous late afternoon event described by defendants' witnesses, summary judgment becomes doubly inappropriate.

Although many state law torts by law enforcement officers do not rise to constitutional violations under 42 U.S.C. § 1983 (1976),[12] the constitutional question is a subtle one of mixed fact and law. Since the state–law claims based on the same events as the § 1983 claims raise genuine issues of material fact, summary judgment on Count 4 must be reversed. As some dispositions of the state–law claims might render the constitutional question moot, we decline to answer it on the present record and thus also reverse summary judgment on the § 1983 claims, without prejudice to defendants' ability to raise the question subsequently, if it should then make a difference.

Although the district court correctly noted that North Carolina has a one–year statute of limitations for assault, battery, or false imprisonment, N.C.Gen.Stat. § 1–54(3) (1969), it did not consider the import of N.C.Gen.Stat. § 1–52(13) (Supp.1979), effective January 1, 1976, which provides for a three–year statute of limitations for actions "[a]gainst a public-officer, for a trespass, under color of his office." Moreover, as claims cognizable under N.C.Gen.Stat. § 109–34 (1978),[13] plaintiff's allegations

---

reverse the district court's judgment on the merits with respect to Count 3 and to remand the case to the district court with instructions to dismiss Count 3 without prejudice for want of jurisdiction. In urging affirmance, however, an appellee is not restricted to the rationale of the district court. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (per curiam). Since the. district court did have jurisdiction over Count 3, we must determine whether its action, dismissal with prejudice under Fed.R. Civ.P. 12(b)(6), was correct.

**11.** No claim of assault has been asserted in connection with Count 3.

**12.** *See, e. g., Paul v. Davis*, 424 U.S. 693, 699–701, 96 S.Ct. 1155, 1159–60, 47 L.Ed.2d 405 (1976).

**13.** *See Price v. Honeycutt*, 216 N.C. 270, 4 S.E.2d 611 (1939) (holding that under the prior version of § 109 ·34 a cause of action lay against a sheriff charged with using excessive force in effecting a wrongful arrest).

would be subject to a six–year statute of limitations under N.C.Gen.Stat. § 1–50(1) (1969). *See State ex rel. Williams v. Adams,* 288 N.C. 501, 503, 219 S.E.2d 198, 200 (1975) (dictum).

Should it prove relevant, we note that the statute of limitations for claims under 42 U.S.C. § 1983 is taken from North Carolina's three–year statute of limitations for "a liability created by statute, either state or federal, unless some other time is mentioned in the statute creating it." N.C.Gen. Stat. § 1–52(2) (Supp.1979). *See Bireline v. Seagondollar,* 567 F.2d 260 (4th Cir. 1977), *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979).

Plaintiff's claims under Count 4, therefore, are not time–barred.

## VI.

Without stating any opinion about the merits of plaintiff's claims, we wish to express our sympathy with the predicament of an overburdened district court which is compelled by precedent to base a denial of summary judgment on evidence which the court believes to be of little credibility. However, notwithstanding the court's desire to see justice done and done expeditiously, on a motion for summary judgment the court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

Dismissal of the claim in Count 3 against defendant Dale Padgett is affirmed. In other respects, the judgment of the district court is reversed, and the case is remanded to that court for further proceedings.

AFFIRMED IN PART; REVERSED IN PART.