**Marcia LANCE, Plaintiff,**

v.

**MEMORIAL MISSION HOSPITAL, INC., Defendant.**

**No. 1:98CV259–C.**

United States District Court, W.D. North Carolina, Asheville Division.

June 22, 2000.

---

Allan P. Root, Root & Root, Weaverville, NC, for plaintiff.

James W. Williams, Roberts & Stevens, P.A., Asheville, NC, for defendant.

## ORDER

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon defendant's Motion for Summary Judgment. Having carefully considered that motion and reviewed the pleadings, the court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

### I. Background

Defendant has fairly portrayed the undisputed facts in this matter in a light most favorable to plaintiff. The following factual summary is drawn therefrom and is intended to aid the decision-making process, but not to bind the court or the parties.

Plaintiff was employed by defendant, Memorial Mission Hospital, Inc., as the Phase II Supervisor for its cardiac rehabilitation program, commonly known as Heart Path. Phase II educated patients in the Heart Path program on such matters as stress management, smoking cessation, and dietary modifications. Plaintiff also directed exercise classes for the program's participants.

The Director of Heart Path and plaintiff's immediate supervisor was Tom Forkner, who gave plaintiff exceptional performance reviews, increased both her responsibilities and compensation, and provided her with leave to continue her nursing education. Immediately prior to her termination, Forkner approved leave that would have enabled plaintiff to attend classes at East Tennessee State University to obtain her Masters of Science in Nursing. That dispensation was allowed, even though the furtherance of plaintiff's education would not directly benefit the hospital, which did not employ nurse practitioners.

The catalyst of this lawsuit was a complaint made during the exit interview of one of the five nurses plaintiff supervised. That nurse, Amy Robillard, complained that plaintiff was a fantastic nurse, but was emotional, rude, and volatile as a supervisor. Defendant has presented evidence that plaintiff's relationship with her employees changed dramatically during the summer of 1997, when plaintiff began to exhibit behavior that defendant considered to be unacceptable for a supervisor. On July 1, 1997, plaintiff angrily counseled Mary Richard, a Phase II nurse and one of plaintiff's close friends, for having gone to Forkner to resolve an issue as to whether Richard was eligible to receive shift differential pay on an occasion when she worked late. During an emotional meeting on the issue with Forkner present, plaintiff screamed at Richard, told her she had a time-management problem, and questioned her work ethic. Richard thought plaintiff's reactions were totally out of character and inappropriate, and she testified that she immediately began looking for a new job as a result of that encounter.

Plaintiff also had a confrontation with Charmaine "Charlie" Rice over the fact that Forkner had asked Rice to develop a CPR program for Heart Path. Plaintiff was upset that Rice had been given that assignment when plaintiff had previously expressed her interest in developing such a program. Plaintiff's perception was that Forkner gave the assignment to Rice instead of to plaintiff as part of an ongoing effort to undermine plaintiff by creating dissension within her staff.

In late August 1997, Gail Sylva, another nurse under plaintiff's supervision, complained to Forkner about plaintiff, the difficulties she had communicating with plaintiff, and the fact that she was being singled out by plaintiff.

Whether a result of coincidence or cause and effect, it is undisputed that plaintiff's behavioral change was concurrent with the defendant's merger of Phases II and III of the Heart Path program due to a recommendation made by the State's Division of Facility Services. It is not disputed that the impending merger of programs would result in the Phase II staff (who were under the supervision of plaintiff) being merged with the Phase III staff (who were under the supervision of Linda Murray.) The merger was to be effective September 15, 1997, and the uncertainty surrounding the merger, coupled with plaintiff's approved absences for school, caused great concern and tension within Phase II.

At the request of Richard, Murray (the Phase III supervisor) held an impromptu meeting with the Phase II staff approximately three weeks before the merger deadline to inform them of pending changes due to the merger. The Phase II employees were noticeably scared and concerned about the fact that plaintiff was not present for the discussion. In fact, Richard told Murray that she was concerned that plaintiff would retaliate against them for meeting without her present.

On August 27, 1997, one day after Murray advised Forkner about the meeting, Forkner met with the Phase II staff to discuss his support for plaintiff and to let the Phase II staff know he was available to address any concerns that they might have. Again the staff were apprehensive about meeting without plaintiff present, but Forkner assured them that he was not trying to go behind plaintiff's back and that he would share the details of the meeting with plaintiff.

Forkner met with plaintiff on August 29 to inform her of his meeting with the Phase II staff. During their discussion, plaintiff told Forkner that he was trying to undermine her authority, and she constantly interrupted Forkner and raised her voice to him. Murray also met with plaintiff to inform her about her impromptu meeting with the Phase II staff. Plaintiff had already learned of the meeting and told Murray that certain Phase II employees were livid at having to meet without plaintiff present and that others felt entrapped and manipulated by Murray.

Alarmed by this, Murray asked the Phase II employees about their comments. Each employee denied the comments attributed to them by plaintiff. Sensing a breakdown in communication between herself and plaintiff, Murray sent plaintiff an e-mail on September 1, 1997, in an attempt to reopen the lines of communication and to address several issues related to the merger. Murray also sent a copy of the e-mail to Forkner. Plaintiff's response was to write sarcastic comments on a copy of the e-mail and circulate it among her Phase II employees. Plaintiff's comments included, "Thanks for nothing guys! Who do I believe anymore?" and, "You sold me out and did not have the guts to tell me."

Plaintiff admits that by the summer of 1997, "emotional outbursts and strong tensions" had escalated among Phase II staff members and that there were "[n]umerous concerns, tensions and conflicts within Phase II." Those outbursts and tensions were affecting Phase II staff. According to plaintiff, Rice was in tears every day and had commented that she hated to come to work, and another staff person told plaintiff that she was considering a transfer our of Heart Path because of the tensions and outbursts. Plaintiff admits to

participating in two emotional outbursts with some of her staff members, but states that she did not believe that she was the "cancer" in the department.

Due to the escalating tensions and concerns of staff members regarding plaintiff's behavior, Forkner sought advice and counsel from Jean Wallis, the hospital's personnel officer with responsibility for the Heart Path program, and Mark Gordon, the hospital's Vice President of Operations. In a meeting on September 3, Forkner informed Gordon about plaintiff's recent behavior and the tensions within Phase II, and he showed Gordon copies of Murray's e-mail and plaintiff's response.

Although plaintiff could have been terminated for her actions, Gordon suggested placing her on probation for a year and giving her a two-week suspension. The following day, Forkner met with Wallis to review the situation. Wallis also suggested removing plaintiff from her supervisory role. Forkner and Wallis met with plaintiff to inform her that she was relieved from her supervisory role and placed on probation. They also presented her an employee corrective-action form, which plaintiff refused to sign, and Forkner then told plaintiff to leave the department until she agreed to sign the form.

That evening, plaintiff contacted her subordinate employees at their homes to tell them that she was being punished and to solicit their support. According to those employees, plaintiff asked them to write letters on her behalf. The next day, four Phase II employees presented to Forkner the letters supporting plaintiff, which conflicted with what the staff members had previously told him. Forkner read the letters and then contacted Wallis for advice. Forkner and Gordon felt that it was very inappropriate for plaintiff to solicit support from her staff members over a confidential personnel issue, partic-

ularly when the reason she was being disciplined was for discourteous and inappropriate interpersonal relations with and harassment of her staff.

Plaintiff briefly returned to work on September 8 to sign the form and add a rebuttal. She then asked Richard for the keys to a file cabinet containing personnel records, including copies of the evaluations of her subordinate employees. Although no longer a supervisor, plaintiff removed the personnel files and took them home. Later that same day, Forkner informed Richard that plaintiff was no longer her supervisor. Richard immediately started crying and informed Forkner that she had only an hour before given plaintiff some personnel files. Forkner then contacted Wallis to seek advice about how to handle the missing files. Forkner also sought advice from Carol Maultsby, who was at that time defendant's Director of Corporate Risk. Maultsby informed Forkner that the files were hospital property and that he had a right and an obligation to get the files back from plaintiff. Forkner also spoke about the issue with Nancy Dexter, defendant's Director of Human Resources, and with Gordon. Although plaintiff could have been terminated, Gordon suggested, and all agreed, that plaintiff should be transferred out of Heart Path to another position with the hospital.

On September 10, Wallis began interviewing employees to clarify the discrepancies between the complaints staff had previously verbalized about plaintiff and their letters of support. Murray told Wallis about Phase II employees coming to her in tears, complaining about plaintiff, and about the lack of communication between herself and plaintiff. Richard told Wallis that she would quit before she would work with plaintiff again.

On September 11, Forkner and Wallis met with plaintiff to discuss her unautho-

rized removal of the personnel files and her contact with and solicitation of letters from her subordinate employees. Forkner informed plaintiff that she had violated hospital policy by removing the personnel records and by breaching the confidentiality of the employee corrective-action process by contacting the Phase II employees. Forkner further told plaintiff that as a result of her actions, she would be transferred out of Heart Path. Plaintiff refused the transfer. At that point, she was given the option to voluntarily resign, which she also refused. As a consequence, plaintiff was discharged for refusing to accept the assignment.

On September 8, 1997, after the first corrective-action meeting, plaintiff delivered to Wallis an employee complaint form appealing her demotion. Plaintiff contends that attached to the form was a letter alleging that more than four years before, Forkner had made sexually suggestive comments to her. Plaintiff further claimed in her letter that she was sensing a conspiracy against her and that "back-stabbing, railroading, finger-pointing, twisted conversations and lies were all being used to plot against [her]."

Wallis testified that she had not looked at the letter until the afternoon of September 11, when Gordon called to ask her about it, which was after plaintiff was terminated. Plaintiff's father had delivered a copy of the letter to Gordon's office earlier that day at 10:20 a.m., during the time Forkner and Wallis were meeting with Lance. Gordon was in a different meeting and did not personally receive and read the letter until the afternoon of September 11. Forkner became aware of plaintiff's letter when Gordon showed him a copy after plaintiff had been terminated. Prior to that time, defendant contends, no one at the hospital told Forkner about the letter or its contents.

Plaintiff claims that Forkner began sexually harassing her from the first month she worked in the Heart Path program, approximately three years earlier. Plaintiff, at the hearing, disavowed any cause of action for sexual harassment and reaffirmed that she was only pursuing a claim of retaliation. Plaintiff claims that Forkner harassed her when he allegedly did the following:

(1) asked her about her dating and sex life while at lunch at the Grove Park Inn in 1992, sometime during her first two or three months of working in Heart Path;

(2) when he made comments to her about earrings depicting male and female genitalia;

(3) when he allegedly told her, "I'm sure you could turn someone on" while she was putting a heart monitor on a patient; and

(4) when he picked up a kiwi fruit and asked Plaintiff what the fruit reminded her of.

Plaintiff further claims that Forkner rubbed her elbow, grabbed her arm, and reached around her in unnecessary ways while the two of them were conducting exercise classes. Plaintiff admits that after July 1993, Forkner made no further remarks of a sexual nature to her.

Plaintiff did not tell any of her coworkers about the harassment at the time it was allegedly occurring, and none witnessed any harassment. She never told anyone about the unwanted touching. Further, she did not say anything about Forkner's alleged misconduct and did not claim retaliation during either meeting with Wallis and Forkner prior to her discharge.

Plaintiff was aware of the hospital's strong anti-harassment policy, yet chose to make a report only after having been de-

moted by Forkner four years after the alleged harassment. In her letter, plaintiff also referenced a consensual relationship between Forkner and Lou Hipps which also had taken place years earlier. While the consensual relationship between Forkner and Hipps was ongoing, plaintiff perceived that it was creating difficulty within Phase II of the Heart Path program, and she took offense at the flirting between Forkner and Hipps. Plaintiff met with Forkner and allegedly instructed him that either she, Forkner, or Hipps had to leave the department. Subsequently, Hipps was transferred to another department, and plaintiff had no further involvement with Hipps after February 1995. Plaintiff never reported the activities of Forkner and Hipps to anyone at the hospital until her letter was received at the time of her termination.

Although plaintiff did not raise her claims until many years after the alleged events occurred, the hospital took her allegations of sexual harassment and retaliation seriously and launched an investigation, but it failed to substantiate any of the allegations. It is plaintiff's contention that despite the excellent reviews given her by Forkner, he really was motivated throughout to injure her employment with the hospital. She claims that her termination was in retaliation for events which occurred several years earlier and Forkner's "need to get even."

## II. Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.,* at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole,* 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a

determination of credibility, summary judgment is improper. *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979).

## III. Retaliation Claim

### A. Jurisdiction

This matter arises under Title VII of the Civil Rights Act of 1964, as amended—42, United States Code, Sections 2000e, *et seq.* Plaintiff claims that she was discharged in retaliation for making claims of harassment. This court has jurisdiction over plaintiff's claims. 28 U.S.C. § 1343; 42 U.S.C. § 2000e(5)(f)(3).

### B. Establishing a *Prima Facie* Case of Retaliation

■ A plaintiff may establish a case of retaliation for making charges of sexual harassment through use of a *"McDonnell Douglas* scheme." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991). To make out a *prima facie* case of retaliation, plaintiff would have to show the following:

(1) she engaged in protected activity;

(2) she was subjected to an adverse employment action; and

(3) a causal relationship existed between the first two elements.

If a plaintiff establishes such a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon such a showing by the defendant, the burden would then shift back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons, but were pretext for retaliation. *Id.* To make such a showing, the plaintiff must prove that "but

for" the protected conduct, the adverse employment action would not have occurred.

■ Without doubt, plaintiff tendered her belated complaint about Forkner to the defendant immediately before her termination. She, therefore, has satisfied the first two elements of a *prima facie* case.

■ Plaintiff's next burden is one of production—to produce evidence of a causal link between the first two elements that would satisfy the third element of a *prima facie* case. Close temporal proximity between the first two elements has been held to satisfy the third element. *See Carter v. Ball,* 33 F.3d 450, 461 (4th Cir.1994) (five months); *Williams v. Cerberonics, Inc.,* 871 F.2d 452 (4th Cir.1989) (four months). Likewise, distant temporal proximity may indicate no retaliatory motivation. *See Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739 (11th Cir.1996). In this case, plaintiff has presented evidence of close temporal proximity of a few days, if not hours, which constitutes evidence upon which a reasonable jury could find a causal connection. Plaintiff has also presented evidence from which a jury could draw a reasonable inference that Forkner, while not the ultimate decision maker, was the catalyst behind resolving the issue at a higher level within the hospital.

This is not to say that defendant has not presented a logical case as to what may actually have occurred. It has. While determinations of credibility are left to the trier of fact, the playing of the sexual-harassment card on a "stale claim" only after substantial disciplinary action has occurred is most suspect. On summary judgment, however, the court is limited to determining whether plaintiff has presented evidence upon which a jury could find in plaintiff's favor. Plaintiff has established a *prima facie* case.

In response to the *prima facie* case, defendant has properly articulated a legitimate, nondiscriminatory reasons for the employment action(s). Specifically, defendant has articulated that plaintiff was discharged because she refused to accept reassignment to a different position within the hospital; she was demoted due to her actions in creating conflict within Phase II; and she was to be reassigned within the hospital for breaching the confidentiality of the employee corrective-action process and for removing hospital personnel files after she was no longer in a supervisory capacity.

The burden now shifts back to plaintiff. As defendant properly pointed out in a supplemental memorandum, the Supreme Court held two days before in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), that a plaintiff's burden after a defendant had proffered a legitimate, nondiscriminatory reason, was to tender evidence upon which a reasonable jury could find that such reason was not the real reason, but pretext for discrimination, eliminating the need to show "pretext plus." The issue now is whether plaintiff has presented sufficient evidence for a reasonable jury to find that the hospital's asserted justification is false.

The defendant's position—that no ultimate decision maker knew of the sexual-harassment claim before the decision to terminate was made—raises an issue of credibility, which necessarily precludes summary judgment. Had plaintiff been fired on September 7, there is no doubt but that the case would end here. Plaintiff has presented evidence that she personally tendered her complaint to a decision maker on September 8. Whether to accept defendant's position-that no one with authority to terminate plaintiff read that complaint before plaintiff was terminated on September 11—is simply a call that a jury will have to make after listening to all the evidence and observing the demeanor of the respective witnesses. While plaintiff's case hangs by the thinnest of threads, the court cannot find that such issue of fact is so weak that no rational fact finder could conclude that the action was discriminatory.

The court will deny defendant's Motion for Summary Judgment without prejudice at this time. At the conclusion of plaintiff's case, the court will carefully reconsider whether this case should be taken away from the jury. Plaintiff is cautioned that while this is a favorable legal decision, it is highly probable that a judgment will not ultimately be rendered in her favor. Counsel for the respective parties are encouraged to further discuss amicable resolution of this matter.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion for Summary Judgment is **DENIED** without prejudice as to renewal at the close of plaintiff's case in chief.

Respective counsel are informed that this is now the first matter on for trial beginning July 10, 2000, at 9 a.m.

This Order is entered in response to defendant's Motion for Summary Judgment (# 19).