Donna DEWITT, Plaintiff,

v.

MECKLENBURG COUNTY, a corporate governmental unit organized pursuant to the laws of North Carolina, and R. Wayne Weston, individually and in his capacity as Director of the Parks and Recreation Department of defendant Mecklenburg County as well as an agent of defendant Mecklenburg County, Defendants.

No. Civ. 3:97CV579–H.

United States District Court,
W.D. North Carolina,
Charlotte Division.

June 25, 1999.

Michael A. Sheely, Sheely and Young, Charlotte, NC, for Plaintiff.

Richard L. Rainey, G. Michael Barnhill, W. Clark Goodman, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for Defendants.

## MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on "Defendants' Motion for Summary Judgment" (document # 17) and "Memorandum

in Support ..." (document # 18), both filed March 30, 1999. "Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment [and] Request for Oral Argument" (document # 24) was filed on May 14, 1999, and "Defendants' Reply to Plaintiff's Brief in Opposition" (document # 26) was filed on May 25, 1999. Plaintiff also filed a "Response to Defendants' Reply ..." (document # 28) on May 28, 1999. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this matter is now ripe for disposition.

Having fully considered the Defendants' motion, the parties' arguments, the record, and the applicable authorities, the Court will *grant* "Defendants' Motion for Summary Judgment" in its entirety.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Donna DeWitt, a white female, was employed as an "Athletic Coordinator" with Defendant Mecklenburg County ("the County") in its Parks and Recreation Department ("the Department") from July 1992 through March 5, 1998.[1] Plaintiff's chief responsibility was to plan and coordinate athletic events for the public, including, but not limited to, adult softball leagues. Plaintiff, the only female among seven athletic coordinators for much of her active tenure with the Department,[2] essentially alleges that she was discriminated against on the basis of her gender and in retaliation for her complaints of unfair treatment, culminating in her termination on March 5, 1998.

The primary events giving rise to this litigation allegedly began in the Fall of 1995.[3] In October, 1995, four of the De-

---

1. In July, 1992, the county consolidated its Parks & Recreation department with its counterpart in the City of Charlotte; prior to that time, Plaintiff had been employed by the City as an Athletic Specialist.

2. The record indicates that a number of females served in other supervisory positions within the Department, including at least two in Plaintiff's direct chain of command at various points in time. Moreover, a number of females were hired specifically as Athletic Coordinators during Plaintiff's leaves of absence.

3. The Plaintiff in her initial EEOC charge complained of conduct beginning in October 1995 (despite the fact that some of this conduct occurred more than 180 days prior to the filing of the charge). Plaintiff in her Complaint and deposition testimony has also alleged one or two earlier instances of unfair discipline or casual, potentially sexist remarks. Not having been the subject of a timely EEOC charge, these allegations will not be considered relevant to Plaintiff's claims. *See* 42 U.S.C. § 2000e–5(e)(1) (1997). "Incidents outside of the statutory window

partment's six male Athletic Coordinators attended an Athletic Director's workshop in Boone, North Carolina sponsored by the North Carolina Recreation Park Society ("NCRPS"). The record indicates that the four men who attended were all active members of the NCRPS, while Plaintiff was not a member and had never previously requested to attend nor attended this particular workshop. Defendant Wayne Weston, the Director of the County Parks and Recreation Department, testified that Plaintiff did not attend the Boone conference because she did not ask to go, and that Plaintiff was shortly thereafter sent to the NCRPS Annual Conference in November, 1995. Plaintiff contends that she had previously been sent to a number of other conferences without having requested to attend.

On November 16, 1995, Plaintiff misinformed a league softball team coach regarding the time at which her team was scheduled to play, and, as a result, the game had to be rescheduled. Plaintiff testified that the next morning, Weston yelled at her about this incident; suggested that to prevent such errors she should do her job "like the men in the Department" and post her softball game schedules; and said, "Look at your desk compared to the male coordinators' desks ... These desks look like athletic coordinators' desks."

The Department was subdivided into several geographic districts—one for each Athletic Coordinator—in December, 1995. Plaintiff was initially assigned to the East District under its supervisor, Lola Massad. Massad reported to Assistant Director James Foster, who in turn reported to Weston. In February 1996, Plaintiff requested, but was denied, a transfer from the East District to the South District.

On February 21, 1996, each of the Athletic Coordinators was directed by Weston to submit plans for two new road races in his or her respective district. As of March 8, 1996, the deadline for submission, Plaintiff and another Athletic Coordinator, Rick Barbrey, had not submitted their plans, despite having been reminded on March 6. At Weston's instruction, each was disciplined by being given one day of "Decision Making Leave," essentially a one-day paid suspension to be used to consider how to improve their job performance. Although Plaintiff was notified of this sanction by Lola Massad, her female supervisor, Plaintiff complained in a written memorandum that Massad 1) had told Plaintiff on February 29, 1996 "not to worry" about submitting the new road race plans; 2) on March 11 said she had not realized "how serious" Weston was about the March 8 deadline, but that she was not going to "write [Plaintiff] up" or "do the things that Mr. Weston wanted done to [her]"; and 3) had said that she "did not want to" suspend Plaintiff. Plaintiff concluded this memorandum by stating "I want to make it clear that I have been treated in a degrading manner because of my sex during the past three years. There is no excuse for this treatment."

Upon consultation with a Compliance Officer in Defendant's Human Relations office, Weston determined that his initial recommendation of paid suspension for both Barbrey and Plaintiff had been too harsh (largely because he interpreted their failure as one of insubordination, not merely poor performance). Thus, he instructed Plaintiff's and Barbrey's supervisors to rescind the suspensions and to give each of them a written reminder and a "coaching session" regarding job performance, in accordance with the County's progressive discipline policy.

Beginning on March 14, 1996, Plaintiff took a paid medical leave of absence, allegedly due to stress and anxiety allegedly caused by her work environment. On April 4, 1996, while on leave, Plaintiff re-

are time-barred unless they can be related to a timely incident as a 'series of separate but related acts' amounting to a continuing violation." *Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir.1997), *citing Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980) (*per curiam*).

quested a transfer from the East district to the Southwest District. The record is unclear as to how this request was specifically handled, but it is undisputed that when Plaintiff returned to work on November 8, 1996, she was assigned to the Central District.

On April 25, 1996, Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"),[4] alleging that she had been "harassed because of [her] sex (female), subjected to different terms and conditions of employment than the male Athletic Coordinators ... and on March 12, 1996 ... suspended without prior disciplinary actions." She also made reference to not being informed of or authorized to attend the Boone NCRPS conference in October, 1995 and to Weston's having yelled at her and instructed her to "be like the men athletic coordinators" on November 17, 1995.

On July 1, 1996, Plaintiff filed an amended EEOC charge, alleging that although she was then on a medical leave of absence, she "continue[d] to be harassed and intimidated"; that she believed her she would be "written up" upon returning to work either for her activities while on medical leave or for allegedly writing an anonymous letter "reporting violations in the [D]epartment"; that she did not believe her job was being held for her because the Department had hired three permanent Athletic Coordinators although it had only two permanent vacancies; that one of the new hires had been assigned to her district; and that she believed these actions were based on her gender or in retaliation for her previous charge of discrimination.

On September 9, 1996, Plaintiff amended her EEOC charge again, this time adding allegations that while she was still working "race files" had been "purposefully withheld" from her; that records which she turned in upon beginning her leave of absence were not distributed for handling by other Athletic Coordinators and she was being blamed publicly for certain mishaps which resulted; and that she believed these actions were likewise based on her gender or in retaliation for her previous charge of discrimination. Exhibits to Plaintiff's amended charge indicate that Plaintiff had turned in her files to Lola Massad as instructed, and that Plaintiff believed that Massad and/or Weston had deliberately failed to distribute her files in order to make her look less competent.

During her leave of absence, Plaintiff was evaluated and treated by Dr. Wanda Spolnicki, her primary care physician, for "stress and depressive symptoms related to her job." Dr. Spolnicki informed the County, in a letter dated June 17, 1996, that she recommended that "Plaintiff take a leave of absence from work in order to maintain her health" and that Plaintiff find another position with the County "unless the situation changes, i.e., she is not under the same pressures she was prior to her leave of absence." The record indicates that Plaintiff was prescribed Xanax and other antidepressant medications; received counseling through the Employee Assistance Program; and was also evaluated and treated by Dr. Angela Wheeler, Ph.D., a psychologist, for her symptoms.

On October 30, 1996, Dr. Spolnciki released Plaintiff to return to work effective November 8, 1996, provided that she "have no contact with Mr. Wayne Weston." In a letter to Plaintiff's counsel dated September 11, 1996, Dr. Wheeler concurred that Plaintiff should not return to her former job "while Mr. Weston and his administration are in positions of authority over her."

Upon Plaintiff's return to the Department on November 8, 1996, she was assigned to the Central District II under the Supervision of Park District Supervisor Melinda Frazier (who reported to Assistant Director Isaac Applewhite). The rec-

---

**4.** The record also contains a letter dated March 21, 1999 from Plaintiff's counsel to the EEOC setting forth substantially the same allegations, although not on the "Charge of Discrimination" form used by the EEOC for the formal filing of a charge.

ord indicates that at about this time, the Department was attempting to counter the community perception that it merely administrated a softball league and to focus on revitalizing several underutilized inner city parks. Moreover, all County agencies had been instructed to implement means of setting and measuring completion of goals in an effort to focus on customer service. Thus, as Plaintiff was returning to work, the Department had just begun to formulate performance-related goals for its Athletic Coordinators in each district.

Due to the timing of her return, Plaintiff was the first Athletic Coordinator to be presented with a list of job goals, called Tasks to Be Accomplished ("TTBA"). Weston and a number of other witnesses testified that similar TTBAs were given to the other Athletic Coordinators over the next several months as they underwent their respective annual evaluations. Plaintiff alleges that she was singled out for the imposition of TTBAs; that her list contained more tasks and more menial tasks (such as a requirement that she attempt to establish secondary sports such as whiffle ball and table tennis) than those ultimately issued to other Athletic Coordinators; and that other Athletic Coordinators were not actually measured or evaluated in terms of their completion of their TTBAs as was she. The record does not reflect any instances of discipline or reprimand based on Plaintiff's failure to complete her TTBAs, however.

On December 16, 1996, Plaintiff wrote a memo to two County Commissioners complaining that she had been subjected to certain unnamed "unfair, disrespectful, demeaning, and malicious acts," was being forced to endure a "hostile environment ... in order to keep [her] job," and believed that tax dollars had been spent to " 'cover-up' all of these acts." In particular, Plaintiff complained that the Department as a whole had been "falling apart slowly" and was "losing good, honest, sincere employees who refuse to be treated the way we are being treated by Mr. Weston and some of his administration"; that "the majority of employees have no role model to follow in a leader"; that "County policies, as well as federal laws are broken on a regular basis"; that she had been "threatened, cussed at, verbally abused, harassed, and discriminated against under the direction of Mr. Wesson"; that "[m]any employees have tried to express their concerns to the Human Resources Department and all they seem to be able to do is plea bargain to pacify us or most of all keep us **quiet!!!!!!**" (emphasis in original); and that she had "witnessed many spiteful and unethical acts toward fellow employees, and Mr. [County Manager Gerald] Fox and Ms. [Assistant County Manager Wanda] Towler seem to be supportive of all of it." County Human Resources Director Susan B. Hutchins responded to Plaintiff's memorandum on January 13, 1997, requesting specifically that Plaintiff provide a written report of any violations of County policy or federal law to permit the County to investigate her allegations.

On March 5, 1997, Plaintiff began a second medical leave of absence for stress and anxiety problems. The record indicates that Plaintiff was given 12 weeks of unpaid leave under the provisions of the Family and Medical Leave Act and 40 more weeks of unpaid extended medical leave. She was also informed in a June 23, 1997 letter that the County would work with her to find her a suitable alternative position, but that if none could be found then her employment would terminate after her 52 total weeks were up, effective March 4, 1998.

During this extended medical leave, Plaintiff requested a transfer to any position of comparable salary where she would not have to have any direct or indirect contact with Weston (again citing her doctor's restriction on such contact). The County attempted to accommodate this request, but since Weston served as head of the entire Department, Plaintiff's condition precluded her from receiving a transfer within the Department. Nevertheless, the County attempted to find other suitable

positions for Plaintiff, and instructed her to keep an eye on the County job vacancy list and indicate her interest in any·openings for which she believed herself to be qualified. Although Plaintiff applied for "a couple" of positions with the City and with non-governmental sports-related businesses, she did not apply for any County positions because she did not see any for which she felt qualified. The County did suggest that she might be able to work as a ·caseworker in its Department of Social Services, but Plaintiff indicated that she was not interested in the position and a physician who evaluated Plaintiff at the County's behest concluded that she would not be suitable for such a position based on her qualifications and her current mental and emotional health. ·

By letters dated April 25 and May 2, 1997, Plaintiff's counsel requested that her EEOC charges be amended to include additional allegations that the County "refused to place [Plaintiff] in another job after being informed by her doctor(s) of medical reasons why she could not work under the supervision (directly/indirectly) of Weston" and left uncertain her job status while on leave; that Weston told Plaintiff's disability insurance carrier that Plaintiff "was just an employee trying to use the system to stay out of work" and that there was "nothing wrong with" her; that Weston did not forward Plaintiff's leave paperwork to the right people in a timely fashion; and that both the County and Weston were responsible for "[d]estroying her career as an athletic coordinator."

Having been informed that Plaintiff was unable to work in any position requiring direct or indirect contact with Weston, the County notified Plaintiff on June 23, 1997 that it would be filling her Athletic Coordinator position permanently. Upon the expiration of Plaintiff's 52–week unpaid medical leave period, Plaintiff had not obtained any other suitable county employment, and thus she was terminated effective March 5, 1998. ·

On September 15, 1997, at Plaintiff's request, the EEOC terminated its prelimi-nary investigation of Plaintiff's charges and issued her a "right-to-sue letter." On October 13, 1997, Plaintiff filed the instant Complaint against the County and Weston in Mecklenburg County Superior Court, alleging a litany of state and federal claims arising out of the above recited events. On November 18, 1997, Defendants removed the action to this Court. On March 30, 1999, following the completion of discovery, Defendants filed the present Motion for Summary Judgment, which is now ripe for disposition.

## II. *DISCUSSION OF CLAIMS*

Pursuant to Federal Rule of Civil Procedure 56(c), a summary judgment motion should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See also Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979). Once the moving party has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the· non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249–50, 106 S.Ct. 2505.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. *Id.* at 255, 106 S.Ct. 2505; *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990); *Cole v. Cole,* 633 F.2d 1083 (4th Cir.1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotations omitted).

Applying the foregoing principles, Defendants are entitled to judgement as a matter of law on each of Plaintiff's claims, as discussed below.

### A. *Plaintiff's Title VII Gender Discrimination Claims*

Title VII of the Civil Rights Act of 1964, § 42 U.S.C. § 2000e *et seq.* makes it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

This statute on its face clearly prohibits discharge or differential treatment of employees because of their sex; however, because the workplace environment is one of the "terms, conditions, or privileges of employment," Title VII has also been held to create a cause of action in favor of persons forced to work in a "hostile work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (establishing "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment"). *See also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114

S.Ct. 367, 126 L.Ed.2d 295 (1993) (discussing elements of hostile work environment claims).

Despite the fastidious outlining, numbering, and internal cross-referencing contained in Plaintiff's Complaint and her counsel's memoranda, it is unclear whether Plaintiff is attempting to establish a claim for a hostile work environment based on her sex, a general disparate treatment claim, or both, in addition to her claim for wrongful discharge. Accordingly, out of an abundance of caution, it will be assumed that the Plaintiff seeks to raise all three claims in her Complaint and subsequent pleadings.

### 1. Disparate Treatment

The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), established an allocation of the burden of production and an order for the presentation of proof in Title VII disparate treatment cases. The plaintiff in such a case must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination, specifically:

> that (1) she is a member of a protected class, (2) she was performing her job at a level that met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees received more favorable treatment.

*Carroll v. Town of University Park*, 12 F.Supp.2d 475, 484 (D.Md.1997), *citing McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817, *and Wileman v. Frank*, 979 F.2d 30, 33 n. 5 (4th Cir.1992).[5]

---

**5.** Although the *McDonnell Douglas* test was initially formulated in the context of a wrongful termination claim, the same framework has also been employed in the context of failure to promote and other types of disparate treatment cases. *See, e.g. Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959–60 (4th Cir.1996) (modifying last three elements for failure to promote claim as follows: "(2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected for the position under cir-

cumstances giving rise to an inference of unlawful discrimination"), *citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir.1985) (prima facie case of unequal disciplinary treatment requires showing "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person").

Under *McDonnell Douglas* and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), once the plaintiff establishes a *prima facie* case of discriminatory treatment, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory" reason for the challenged employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer carries this burden of production, the presumption of discrimination "drops out of the picture," and the plaintiff "bears the ultimate burden of proving *both* that the employer's asserted reason was pretextual and that the plaintiff's [sex] . . . was the true reason for the adverse employment action." *Id.* at 510–11, 515–16, 113 S.Ct. 2742 (emphasis added). Thus, "although the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 506–07, 113 S.Ct. 2742, *quoting Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

In the case at bar, Plaintiff has recited a litany of incidents, comments, and alleged slights which she contends support her Title VII discrimination claim. The Court is mindful of its obligation to consider the evidence of record *in toto*, rather than on a piecemeal basis, in order to determine whether the terms and conditions of Plaintiff's employment were sufficiently altered to warrant employer liability under Title VII. *See, e.g., Brown v. Eckerd Drugs*, 663 F.2d 1268, 1270 n. 3 (4th Cir.1981) (court must "evaluate the plaintiff's prima facie case as a whole" rather than evaluating "each piece of evidence seriatim"), *vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2952, 73 L.Ed.2d 1345 (1982). However, neither may the Court oblige Plaintiff's request that every employment decision concerning her be micro-analyzed for unfairness. As the Fourth Circuit has emphasized, "Title VII is not a vehicle for substituting the judgment of a court for that of an employer." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998), *citing Jiminez v. Mary Washington College*, 57 F.3d 369, 377 (4th Cir.1995). It is not for this court to "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination. . . ." *Id.,citing Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997) (quotations and citations omitted), *and EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992).

■ More importantly, regarding a number of the alleged instances of discrimination cited by Plaintiff, the undisputed material facts are simply insufficient to implicate Title VII—or even to suggest discriminatory animus—whether considered in isolation or in the larger context of Plaintiff's overall claim. For example, Plaintiff complains that she was "not permitted" to attend the NCRPS conference in Boone because she was a woman. The record is clear, however, that Plaintiff did not request to attend this conference, was certainly not prevented from going by Weston or anyone else in the Department, did not receive information about it because she was—of her own choosing—not a member of the NCRPS, had never attended the conference before, and (most tellingly) was permitted to attend a similar conference *the very next month.*

Similarly, Plaintiff complains that her request for a transfer out of the East District was denied; the record indicates that while such a request may have been initially denied, Plaintiff almost immediately took a leave of absence, again requested a transfer while on leave, and, upon her return, was assigned to another district—just as she had requested.

■ Equally without merit is Plaintiff's complaint regarding the paid day of suspension she received for failing to turn in her proposed race plans as assigned.

To establish a *prima facie* case of disparate treatment regarding employee discipline, a plaintiff must show that similarly situated employees, outside the protected class, engaged in acts of comparable seriousness, and that these employees were treated less severely. *Cook v. CSX Transportation Corp.*, 988 F.2d 507, 511 (4th Cir.1993); *Johnson v. Burnley*, 887 F.2d 471, 479 (4th Cir.1989). *Accord, Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C.Cir.1995); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). In this case, the record reveals undisputedly that when Plaintiff was formally disciplined (for failing to submit proposed plans for two road races in her district) she was given the exact same punishment as a male employee—a day of suspension with pay to consider her actions. Moreover, when Plaintiff complained, her punishment was actually reduced to a written reminder and required attendance at a "coaching session"—again, the exact same sanction imposed on the male employee who committed the same error. Once again, there is no plausible inference of discriminatory animus in these facts.

Also devoid of substance or merit are Plaintiff's speculations that Weston was looking for a way to terminate her or that the Department did not hold her position for her while she was on medical leave; that Weston intentionally mishandled her leave paperwork or interfered with her disability and/or medical insurance benefits; that the TTBAs were given to her alone based on her gender or were somehow calculated to make her job impossible or intolerable; or that she was given negative evaluations and denied a salary increase. The factual record—irrespective of any considerations of credibility—contradicts Plaintiff's conjecture as to Defendants' motive and, more importantly, demonstrates an absence of any tangible harm to the Plaintiff on every one of these allegations. It is clear that Plaintiff was restored to a comparable position upon returning from medical leave; that Plaintiff was properly given leave and that her disability and medical insurance benefits were not altered; that TTBAs were implemented for all employees (and that Plaintiff had prior to their implementation complained about not knowing what was expected of her); and that Plaintiff was actually given favorable job reviews and increases in salary—even retroactively while she was on medical leave.

In short, Plaintiff's allegations, even considered *in toto*, are insufficient to establish a prima facie case of disparate treatment; Plaintiff has neither shown that she suffered an actionable adverse employment action (other than her ultimate termination and the stress and anxiety associated with her harassment claim, each of which is discussed separately below), nor satisfied her burden to demonstrate that "the terms and conditions of her employment were affected *because of her status as a woman,* not simply as a result of personal incompatibility and petty grudges." *Campbell v. Masten*, 955 F.Supp. 526, 528 (D.Md.1997) (emphasis added). Plaintiff's mere speculation and conjecture as to Weston's motives are wholly inadequate to support a claim of intentional discrimination. *See, e.g., Lovelace v. Sherwin–Williams*, 681 F.2d 230, 241–42 (4th Cir.1982); *Goldberg v. B. Green and Company*, 836 F.2d 845 (4th Cir.1988) (speculative assertions that Defendants' state of mind and motive are in dispute are not enough to withstand summary judgment).

Indeed, where a number of the challenged employment decisions were made or implemented by a member of Plaintiff's own gender—specifically, in this case, Lola Massad (disciplinary action and direct supervision), Melinda Frazier (implementation of the TTBAs and direct supervision), and Susan Hutchings (personnel decisions relating to Plaintiff's leave and ultimate termination)—the Plaintiff's unsupported, self-serving allegations are particularly unpersuasive. *See Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 1002 (5th Cir.1996) (*en*

*banc* ) ("[I]n a Title VII case alleging discrimination because of race, proof that all of the decision makers were members of the same race as the complaining party would considerably undermine the probability that race was a factor in the employment decision"); *Dungee v. Northeast Foods, Inc.,* 940 F.Supp. 682, 688 n. 3 (D.N.J.1996) ("The fact that the final decision maker and both· interviewers are members of plaintiff's protected class ... weakens any possible inference of discrimination"); *Marlow v. Office of Court Admin. of State of N.Y.,* 820 F.Supp. 753 (S.D.N.Y.1993), *aff'd* 22 F.3d 1091 (2d Cir. 1994) (pointing out that because some of the decision makers were members of the same protected age group as plaintiff, plaintiff's ability to raise an inference of age discrimination was hampered); *Toliver v. Community Action Comm'n to Help the Economy, Inc.,* 613 F.Supp. 1070 (S.D.N.Y. 1985) (given racial composition of 11–person board(6 were black and 3 were black men), contention by black male plaintiff that his termination was due to race and sex discrimination was implausible).

Finally, even were the record to support a *prima facie* case of disparate treatment, Defendants have articulated legitimate, nondiscriminatory reasons for each of the challenged employment actions. Plaintiff has provided no evidence to disprove Defendants' explanations, much less to establish that gender was the true motivating factor for each of the decisions—several of which, again, were made or implemented by female supervisors.

### 2. Wrongful termination

Plaintiff also alleges that the County failed to find her suitable alternative employment, and that her ultimate termination was a product of gender bias. However, Plaintiff's allegations in this regard are also unsupported by the factual record.

**6.** Plaintiff's potential constructive discharge claim is only cognizable under federal law, as North Carolina has not recognized the tort of constructive discharge. *See Graham v. Har-*

■ "[W]hen an employer articulates a reason for discharging the ·plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette,* 133 F.3d at 298–99, *citing Giannopoulos,* 109 F.3d at 410–11. In the instant matter, the decision to· terminate Plaintiff was based on her not finding any suitable alternative employment with the County during her one year leave of absence; was a result of the operation of County policy and the Plaintiff's own determination of what jobs she would and would not consider; and was ultimately implemented by a woman, Susan Hutchins of the County Human Resources Department. These circumstances simply do not suggest that Plaintiff was terminated because of her gender. Indeed, any inference of discriminatory animus on the part of Weston or the County is belied by the record, which indicates that females ˙served in supervisory positions throughout the Department and that a· number of female athletic Coordinators were hired while Plaintiff was on medical leave.

In spite of these undisputed facts, Plaintiff alleges that she was constructively discharged. An employer may be held liable for constructive discharge only when the Plaintiff can show that the employer "deliberately ma[de] an employee's working conditions intolerable and thereby force[d] him to quit his job." *Johnson v. Shalala,* 991 F.2d 126, 131 (4th Cir.1993). *Accord, EEOC v. Clay Printing Co.,* 955 F.2d 936, 944 (4th Cir.1992); *Bristow v. Daily Press, Inc.,* 770 F.2d 1251,.1255. (4th Cir.1985).[6] The Fourth Circuit has cautioned that constructive discharge claims must be "carefully cabined" by district courts because "the claim of constructive discharge is so open to abuse by those who leave employment of their own accord." *Paroline v.*

*dee's Food Systems, Inc.,* 121 N.C.App. 382, 385, 465 S.E.2d 558, 560 (1996); *Cortes v. McDonald's Corporation,* 955 F.Supp. 539, 540–41 (E.D.N.C.1996).

*Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989) (Wilkinson, J., concurring in part and dissenting in part), *adopted en banc*, 900 F.2d 27, 28 (4th Cir.1990).

■■■ A plaintiff asserting a constructive discharge claim must therefore offer evidence of both the deliberateness of the employer's actions and the intolerability of the working conditions. *Bristow*, 770 F.2d at 1255; *Johnson v. Shalala*, 991 F.2d at 131. Deliberateness may be shown "by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment." *Johnson v. Shalala*, 991 F.2d at 131. The second element, intolerability, must be "assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Bristow*, 770 F.2d at 1255. Furthermore, when the constructive discharge claim is predicated on Title VII, the intolerable working conditions must result from *discriminatory* employment practices. *EEOC v. Federal Reserve Bank*, 698 F.2d 633, 672 (4th Cir.1983) (citations omitted) (emphasis added), *rev'd on other grounds*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).

■■■ Plaintiff's evidence is insufficient to create a genuine issue of material fact as to either element of a constructive discharge claim. As demonstrated in the cases cited by Defendants, the mere fact that an employee was required to work under stressful conditions is insufficient to establish a constructive discharge claim under Title VII. *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355 (10th Cir. 1997) (no constructive discharge where employee refused to return to work for supervisor who made five "unpleasant and boorish" remarks to her over a sixteen month period); *Hanenburg v. Principal Mutual Life Ins. Co.*, 118 F.3d 570 (8th Cir.1997) (no constructive discharge where employer held employee to higher attendance standard, more closely scrutinized her performance, and monitored her personal phone use); *Summit v. S–B Power Tool*, 121 F.3d 416 (8th Cir.1997) (no constructive discharge where employee alleged that she was transferred to second shift, made to supervise temporary employees, given defective parts to work with, reprimanded, and threatened with discharge), *cert. denied*, —— U.S. ——, 118 S.Ct. 1185, 140 L.Ed.2d 316 (1998). *See also Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")

Moreover, the record contains no evidence of the County's intent to force Plaintiff from her job; indeed, her job was kept open for her during two extended leaves of absence. Only once she informed the County that she would not and could not work anywhere in Weston's entire department (even if supervised by him only "indirectly") was her position as an Athletic Coordinator filled on a permanent basis. Even after that, the County attempted to find suitable alternative employment for Plaintiff, and it was she who ruled out all of the options presented to her based on a lack of interest or qualifications. There simply is no basis upon which a reasonable jury could find that the County intentionally tried to impose harsh and unreasonable conditions on Plaintiff's continued employment in order to force her resignation, nor that a reasonable person in Plaintiff's position would have felt compelled to resign altogether from County employment if unwilling or unable to work in Parks & Recreation.

**3. Hostile Work Environment**

■■■ To establish a hostile work environment claim under Title VII, a plaintiff must prove the following elements:

(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an

abusive work environment; and (4) it was imputable on some factual basis to the employer.

*Spicer v. Commonwealth of Virginia, Dep't of Corrections,* 66 F.3d 705, 709–10 (4th Cir.1995), *citing Harris v. Forklift Systems. Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), *and Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir. 1987).

▮ Plaintiff alleges that Weston subjected her to a hostile work environment based on her gender over the course of two years by refusing to permit her to go to a conference (which she had previously neither attended nor requested to attend); reprimanding her harshly on one occasion; telling another Department employee that Plaintiff would be terminated when she returned from medical leave; imposing a stringent set of TTBAs on her when she did return; mishandling her work files so as to make her look incompetent while she was on leave; and misdirecting her insurance and leave paperwork. However, Plaintiff's only evidence, other than her own personal speculation, that Weston's conduct towards Plaintiff was "based on sex"—namely, her testimony that Weston reprimanded her on one occasion by saying that she needed to do her job "like the men" and compared her desks to those of the male Athletic Coordinators—is insufficient to establish this element of her claim. *See, e.g., McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1196 (4th Cir.) (refusing to recognize a Title VII claim for sexual harassment based solely on the alleged harasser's "vulgarity and insensitivity and meanness of spirit"), *cert. denied,* 519 U.S. 819, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996).

Similarly, Plaintiff has adduced no admissible evidence of any sexually suggestive remarks, advances, or unwelcome touching, the likes of which is usually required to sustain this type of action. *See, e.g., Katz v. Dole,* 709 F.2d 251, 253 (4th Cir.1983) (hostile environment found where "workplace was pervaded with sexual slurs, insults and innuendo, and [plain-tiff] was personally the object of verbal sexual harassment by her fellow controllers ... [in] the form of extremely vulgar and offensive sexually related epithets addressed to and employed about [plaintiff] by supervisory personnel as well as by other controllers"); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515 (9th Cir.1989) (alleged harasser "repeatedly engaged in vulgarities, made sexual remarks, and requested sexual favors from [plaintiffs]"); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1015 (8th Cir.1988) (describing numerous sexual comments, epithets, unwelcome intimate physical contact, and solicitations for sexual favors).

In this case, Plaintiff's hostile work environment claim is further weakened by the fact Weston had very little direct contact with Plaintiff following her return from her first medical leave; most of the decisions or actions which Plaintiff challenges were imposed on Plaintiff by her immediate supervisors, some of whom were women, and some of whom (according to Plaintiff) intervened to mitigate the presumed harshness of Weston's supervisory edicts. Weston's alleged conduct was simply not sufficiently "severe and pervasive" to give rise to a hostile work environment claim. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998), *citing Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998); *Baskerville v. Culligan International Company,* 50 F.3d 428, 431 (7th Cir.1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage").

### B. *Plaintiff's Title VII Retaliation Claim*

▮ In addition to prohibiting harassment or discrimination in the workplace on

the basis of sex, race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce their rights under the Act. 42 U.S.C. § 2000e–3(a).[7] To establish a prima facie case of retaliatory discharge in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991), *citing Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985), *abrogated in part on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See also Hopkins v. Baltimore Gas and Electric Company,* 77 F.3d 745, 754 (4th Cir.1996); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989).

Once the Plaintiff has made the required *prima facie* showing, the burden shifts to the employer to produce a "legitimate non-discriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." *Ross,* 759 F.2d at 365, *citing Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir. 1980). Finally, if the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. *Id.,citing Womack,* 619 F.2d at 1296; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Essentially, the plaintiff must ultimately show that the adverse action would not have occurred "but for" the protected activity. *Id.* at 365–66. "A causal relationship requires more than simple coincidence … Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." *Bray v. Tenax,* 905 F.Supp. 324, 328 (E.D.N.C.1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." *Childress v. City of Richmond,* 907 F.Supp. 934, 940 (E.D.Va.1995), *aff'd* 134 F.3d 1205 (4th Cir.1998) (*en banc* ), *cert. denied,* —— U.S. ——, 118 S.Ct. 2322, 141 L.Ed.2d 696 (1998); *Mayo v. Kiwest Corp.,* 898 F.Supp. 335, 337, (E.D.Va.1995).

In the present case, it is undisputed that Plaintiff engaged in "protected activity" as of March 21, 1996 at the latest, when her attorney notified the EEOC of her complaints. *See* 42 U.S.C.A. § 2000e–3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or … opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII."). *See also Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir.1998) (same). Plaintiff's ability to establish a *prima facie* case therefore depends on 1) whether Defendants took adverse employment action against Plaintiff after that date and, 2) if

7. Title 42 U.S.C. § 2000e–3 specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

so, whether there was a causal link between her protected activity and any such adverse employment action.

■ Plaintiff's evidence fails to create a genuine issue of material fact as to either of these elements. Plaintiff's primary evidence of retaliatory discrimination is 1) a fellow employee's testimony that she heard from another employee that Weston intended to have Plaintiff terminated upon the expiration of her first medical leave; 2) Plaintiff's testimony that an insurance adjuster told Plaintiff that Weston had said there was "nothing wrong with [Plaintiff]" and she "was just an employee trying to use the system to stay out of work"; and 3) Plaintiff's belief that Weston intentionally mishandled her disability leave papers and insurance papers so as to terminate her coverage.

Leaving aside the dubious admissibility of this testimony, such evidence is insufficient to establish that Plaintiff was subjected to an adverse employment action because of her filing of EEOC charges or complaining to Weston's supervisors regarding his alleged conduct; none of the supposedly retaliatory actions ever came to fruition or resulted in a tangible employment action detrimental to Plaintiff. Indeed, the record indicates that following Plaintiff's initiation of EEOC activity, the County allowed Plaintiff to transfer to a different district with a different supervisor (upon her return from her first medical leave); continued to hold open her Athletic Coordinator position for a reasonable time during Plaintiff's second medical leave; continued to provide Plaintiff with medical and disability insurance benefits; and attempted to help Plaintiff find alternative employment with the County once it became apparent that Plaintiff would no longer be able to work in the Department.

Nor can the Plaintiff establish that retaliation was the "but for" cause of any of the employment actions she considers to have been adverse. Plaintiff's speculation as to the motives behind Weston's actions—including implementation of the TTBA system, as well—are wholly inadequate to establish that any unwarranted employment action was taken against Plaintiff for the purpose of retaliating against her for her protected activity under Title VII. Likewise, as discussed above, Plaintiff's termination was not caused by Weston or the County, but was instead a function of her refusal or inability to find alternative work within the County. *See Diamond v. T. Rowe Price Assoc., Inc.*, 852 F.Supp. 372, 397 (D.Md.1994) (plaintiff's voluntary decision to discontinue his participation in alternative employment program cannot give rise to a viable claim of retaliatory discharge under Title VII).

### C. *Plaintiff's Claim based on Violation of North Carolina Public Policy*[8]

Plaintiff's Complaint also alleges violations of the North Carolina Equal Employment Practices Act ("the N.C.E.E.P.A."), N.C.Gen.Stat. § 143–422.2.[9] Apparently, Plaintiff is attempting to allege a claim based on the "public policy exception" to North Carolina's general rule of at-will employment. However, even when the record is considered in the light most fa-

---

**8.** In the interest of judicial economy, the Court will retain supplemental jurisdiction over Plaintiff's state law claims despite its award of summary judgment on her federal claims. *See* 28 U.S.C. § 1367(a) (1998) ("in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

**9.** N.C.Gen.Stat. § 143–422.2 (1997) reads in pertinent part:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

vorable to the Plaintiff, there is no genuine issue of material fact and therefore Defendants are entitled to summary judgment on this purported claim as well.

 Under clearly established North Carolina law, unless an employment contract expressly states a specific term, employment is terminable at the will of either party. *See generally Coman v. Thomas Manufacturing Company*, 325 N.C. 172, 381 S.E.2d 445 (1989). At will employees may be terminated "for no reason, or for an arbitrary or irrational reason," but not "for an unlawful reason or purpose that contravenes public policy." *Sides v. Duke Univ.*, 74 N.C.App. 331, 328 S.E.2d 818, *disc. rev. denied*, 314 N.C. 331, 333 S.E.2d 490 (1985), *overruled in part on other grounds by Kurtzman v. Applied Analytical Industries, Inc.*, 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). *See also McLaughlin v. Barclays American Corp.*, 95 N.C.App. 301, 382 S.E.2d 836, 840 (1989) (employee-at-will can be terminated for "indifferent and illogical" reasons). As a result, employees may not generally bring common law actions for wrongful termination except in narrowly defined circumstances in which the employee was terminated for a reason which violates the public policy of North Carolina. *Coman*, 325 N.C. at 175–78, 381 S.E.2d 445.

However, North Carolina courts have consistently held that "[t]he public policy exception to the employment-at-will doctrine is a 'narrow exception.'" *Roberts v. First–Citizens Bank*, 124 N.C.App. 713, 721, 478 S.E.2d 809, 814, *app. withdrawn*, 345 N.C. 755, 487 S.E.2d 758 (1997), *quoting Williams v. Hillhaven Corp.*, 91 N.C.App. 35, 39, 370 S.E.2d 423, 425 (1988). *See also Strickland v. MICA Information Systems*, 800 F.Supp. 1320, 1326 (M.D.N.C.1992) (noting that "the only three successful wrongful discharge plaintiffs we find in reported North Carolina cases have had to choose between their jobs and violating the criminal law"), *quoting Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 533 (4th Cir.), *reh'g en banc denied* (4th Cir.1991).

Indeed, plaintiffs have been allowed to proceed with such an action only in a few specific, very narrowly defined circumstances. *See Coman, supra*, (discharge of truck driver for refusing to falsify driver records to show compliance with federal transportation regulations offends federal and state public policy); *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166 (1992) (discharging an employee for refusing to work for less than minimum wage violated public policy); *Sides*, 328 S.E.2d at 826–27 (termination of nurse for refusal to testify falsely or incompletely in medical malpractice trial against employer hospital violates public policy against perjury); *Vereen v. Holden*, 121 N.C.App. 779, 468 S.E.2d 471 (1996) (termination for engaging in political activity protected by the First Amendment violates public policy), *remanded on other grounds*, 345 N.C. 646, 483 S.E.2d 719, *and modified*, 127 N.C.App. 205, 487 S.E.2d 822 (1997); *and Harrison, supra*, (discharge for refusal of supervisor's sexual advances violates public policy against prostitution).

Although North Carolina courts have not clearly defined the boundaries of the public policy exception, the North Carolina Supreme Court has said, "At the very least public policy is violated when an employee is fired in contravention of express public policy declarations contained in the North Carolina General Statutes." *Amos*, 331 N.C. at 353, 416 S.E.2d at 169. Thus, the N.C.E.E.P.A. has been held to permit an action for discharge in violation of public policy in gender discrimination cases. *See, e.g., Hughes v. Bedsole*, 48 F.3d 1376, 1383–84 (4th Cir.1995).

 In no case, however, has a plaintiff been permitted to recover for general disparate treatment or a hostile work environment claim based on this statute; rather, the N.C.E.E.P.A. has only been cited with respect to a *wrongful discharge* claim as a basis for invoking the public policy exception to the doctrine of employment at will.

Moreover, as several courts have noted, the N.C.E.E.P.A. on its face "does not

express any public policy concerning retaliation for opposition to any form of discriminatory practice" and no North Carolina court has interpreted it to establish a claim for retaliatory discharge. *Mullis v. Mechanics and Farmers Bank*, 994 F.Supp. 680, 688 (M.D.N.C.1997); *Chung v. BNR, Inc./Northern Telecom, Inc.*, 16 F.Supp.2d 632, 634, (E.D.N.C.1997); *Leach v. Northern Telecom, Inc.*, 141 F.R.D. 420, 426 (E.D.N.C.1991) (the N.C.E.E.P.A. does not express public policy as to retaliation). Since "extension of the public policy exception to include protection against retaliation for participation in other activities should come, if at all, from the North Carolina courts," *Mullis*, 994 F.Supp. at 688, the Court will not further expand the public policy exception to apply on the facts of this case.

Therefore, Plaintiff's only colorable claim under this state law would be for wrongful discharge based on her gender, in violation of the public policy of North Carolina. As discussed at length above, however, the decision to terminate Plaintiff was based on her not finding any suitable alternative employment with the County during her one year leave of absence; was a result of the operation of County policy and the Plaintiff's own determination of what jobs she would and would not consider; and ultimately was implemented by a woman, Susan Hutchins of the County Human Resources Department. The circumstances surrounding Plaintiff's actual termination simply do not raise any inferences of gender discrimination, and are no more actionable under North Carolina law than under Title VII. *See North Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 301 S.E.2d 78, 82 (1983) (holding that claims of discharge in violation of North Carolina public policy are analyzed under the same evidentiary patterns and standards of law as federal Title VII claims).

### D. *Plaintiff's Free Speech Claim*

Plaintiff also contends that her free speech rights under the United States and North Carolina Constitutions were violated by Defendants' numerous actions. For the reasons discussed above regarding Plaintiff's retaliatory discharge claim, Defendants are also entitled to summary judgment on these claims.

Plaintiff's federal Constitutional claim is predicated on the First Amendment [10] and 42 U.S.C. § 1983, which provides as follows:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Thus, Plaintiff's claim under the free speech clause of the First Amendment merges into her § 1983 claim because § 1983 merely creates a statutory basis to receive a remedy for the deprivation of a constitutional right. *See Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1366 (4th Cir.1989).

Plaintiff contends that Defendants violated her right to free speech under Article 1, Section 14 of the North Carolina Constitution.[11] Liability on this claim, if any, would be against the County or Weston in his official capacity. As explained by the North Carolina Supreme Court:

---

10. The First Amendment to the Federal Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press[.]" This Amendment has been incorporated to apply to the states by virtue of the Fourteenth Amendment. *Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

11. Article 1, § 14 of the North Carolina Constitution provides that "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse."

The Constitution only recognizes and secures an individual's rights vis-a-vis "We, the people of the State of North Carolina," not individual members of that body politic. Of course, the State may only act through its duly elected and appointed officials. Consequently, it is the state officials, acting in their official capacities, that are obligated to conduct themselves in accordance with the Constitution. Therefore, plaintiff may assert his freedom of speech right only against state officials, sued in their official capacity.

*Corum v. University of North Carolina,* 330 N.C. 761, 788 413 S.E.2d 276, 293 (1992).

It is without question that "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), *citing NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982). Nevertheless, as this Court has previously stated in a similar context:

> [T]o acknowledge the lofty stature of the right to free expression is not to demonstrate either that all public employment matters come under the First Amendment or that a highly valued personal interest is also a First Amendment right. Particularly, one's sense of indignity at mistreatment on the job does not

transform the rights trammeled by the mistreatment into First Amendment rights of free speech or petition for redress of grievances. "[G]overnment offices could not function if every employment decision became a constitutional matter" ... [Thus] ... it is not just any form of expression that is protected by the First Amendment in the context of public employment. Instead, it is only when the public employee's expression can be fairly considered as "relating to any matter of political, social, or other concern to the community ... [before] intrusive oversight by the judiciary in the name of the First Amendment" is triggered.

*Baker v. Mecklenburg County,* 853 F.Supp. 889, 892 (W.D.N.C.1994), *aff'd* 48 F.3d 1215 (4th Cir.1995), *quoting Connick,* 461 U.S. at 143, 103 S.Ct. 1684.

Therefore, to establish a valid First Amendment claim, the Plaintiff must show 1) "that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern"; 2) "that the alleged retaliatory action deprived [her] of some valuable benefit"; and 3) "a causal relationship between the expression of public concern and the retaliatory action." *Id.,citing Huang v. Board of Governors of U.N.C.,* 902 F.2d 1134, 1140 (4th Cir.1990), *and Connick,* 461 U.S. at 146, 103 S.Ct. 1684.[12]

Plaintiff's evidence fails to establish a genuine issue of material fact on any of these three elements.[13] First, regard-

12. Having been cited no authority that Article I § 14 of the North Carolina Constitution affords broader protection to freedom of speech by public employees than does the First Amendment to the U.S. Constitution, the Court will consider Plaintiff's state and federal free speech claims according to the same three part test. *See State v. Petersilie,* 334 N.C. 169, 184, 432 S.E.2d 832, 841 (1993) ("for the purpose of applying our State Constitution's Free Speech Clause we adopt the United States Supreme Court's First Amendment jurisprudence.")

13. Additionally, Plaintiff has established no basis for a finding of liability against the County or Weston in his official capacity on

her § 1983 free speech claim because she has not forecast evidence that the violation of her right of free speech resulted from any "policy, custom, or usage" of Mecklenburg County or its Parks and Recreation Department, as is required to establish municipal liability under § 1983. *See Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (to hold municipality liable under § 1983, alleged injury must stem from a policy, custom, or usage *of the municipality* ); *Jordan ex rel. Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir.1994) (outlining "stringent" requirements for imposition of municipal liability); *Spell v. McDaniel,* 824 F.2d 1380, 1385–87 (4th Cir.1987) (plaintiff must prove existence of official policy or custom of

ing the first element, the Supreme Court has stated that whether the expression in question relates to matters of public concern depends on the "content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708. The primary subject of all of Plaintiff's communications with the EEOC, County officials, and her supervisors is *Plaintiff's* mistreatment by Weston and his administration. Although in various letters and at least one EEOC charge she made reference to "classwide sex discrimination" and generally unhappy working conditions within the Department, each and every communication by Plaintiff focused on her personal trials and tribulations and sought relief therefor, and thus in "content, form, and context" her "speech" essentially addressed a private grievance rather than a public concern.

Moreover, even were Plaintiff's repeated complaints regarding her employment situation to be construed as public matters, her free speech claims would nevertheless fail. As previously noted, Plaintiff has failed to adduce evidence that she suffered any tangible job detriment whatsoever in retaliation for her complaints, or that any of the employment decisions that she challenges was motivated specifically by retaliation for her complaints, her grievances, or the filing of her lawsuit.

### III. *ORDER*

NOW THEREFORE, IT IS ORDERED:

1. "Defendants' Motion for Summary Judgment" filed April 20, 1999 (document # 17) is **GRANTED;** Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE.**

municipality that proximately caused constitutional violation to establish municipal liability under § 1983). Accordingly, Plaintiff's claims against the County and Weston in his official capacity (the latter of which is essen-

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED AND DECREED.**

tially a claim against the municipality by whom he is employed, *Monell,* 436 U.S. at 691 n. 55, 98 S.Ct. 2018) will be dismissed for this additional reason.